**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROCHELLE TOLBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 10 C 7940** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Rochelle Tolbert ("Tolbert" or "claimant"), has filed a motion for summary judgment [26] seeking judicial review of the final decision of the Commissioner of the Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), and 1382c(a). In his response [41], the Commissioner asks the Court to uphold the decision of the Administrative Law Judge. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons set forth below, claimant's motion for summary judgment is granted in part and denied in part.

**I.    BACKGROUND**

**A.    Procedural History**

Tolbert filed her applications for DIB and SSI on May 8, 2006, alleging disability beginning April 1, 2005. (R. 135-142.) Her claims were denied initially on August 17, 2006, (R. 77-80), and upon reconsideration on January 18, 2007. (R. 82-87.) A preliminary hearing was held on March 18, 2009 before Administrate Law Judge ("ALJ")

Percival Harmon, at which time ALJ Harmon determined that he needed to obtain Tolbert's recent medical records from Rush University Medical Hospital ("Rush"). (R. 48-61.) Tolbert also waived her right to counsel at that time. (R. 52-53, 110.) ALJ Harmon held a second hearing on June 10, 2009, during which he heard testimony from Tolbert and vocational expert Glee Ann L. Kehr. (R. 11-45.) ALJ Harmon kept the record open after the hearing because he still had not received the records from Rush. (R. 44.)

On August 31, 2009, ALJ Harmon issued a written decision denying Tolbert's applications for benefits. (R. 66-76.) Tolbert filed a timely request for review of that decision. (R. 131-133.) On July 14, 2010, the Appeals Council denied that request. (R. 6-8.) Then, on October 14, 2010, the Appeals Council set aside that denial to consider additional information. (R. 1-5.) But, after reviewing the additional information, the Appeals Council ultimately denied Tolbert's request for review. (*Id.*) As a result, ALJ Harmon's decision became the final decision of the Commissioner. *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). This action followed.

### B. Medical Evidence

#### 1. Treating Physicians

##### a. Harrison Medical Center

Records reveal that Tolbert was under the care of Dr. Mohammad Ahmed at Harrison Medical Center ("Harrison") from May 24, 2005 through March 6, 2007. (R. 228-245, 261-271, 372-382.) As a general matter, at every visit, Tolbert's height was noted as 5'7" and her weight was noted as "350+" or "350++." (*See, e.g.,* R. 232-245.) "Weight reduction" was always noted in the "education & [follow-up]" portion of the

medical records.  (*Id.*)  She also consistently complained of frequent urination and constipation.  (*Id.*)  Her mental status was always documented as "normal," with "no anxiety."  (*Id.*)

On May 24, 2005, Tolbert complained of a cold, sore throat, numbness in her right hand, swelling of her left legs, and severe headaches and dizziness for the previous four days.  (R. 245.)  She also complained of polyuria and nocturia, but denied shortness of breath, dysuria, or discharge.  (*Id.*)  At the time, she was taking only thyroid medication, and hypothyroidism was noted in the section for "past medical Hx."  (*Id.*)  Dr. Ahmed's physical exam revealed an enlarged thyroid, "some rhonchi, distant wheezing," congestion, obesity, swollen hands, and edema in the lower extremities. (*Id.*)  He assessed an upper respiratory infection, rhinitis, headache, dizziness, polyuria, nocturia, hypertension, and pedal edema.  (*Id.*)  Dr. Ahmed prescribed Amoxicillin, Synthroid, Claritin, Amibid, Tylenol, Plendil, and Lozol.  (*Id.*)

Tolbert returned to Harrison on June 23, 2005 with the same complaints as at the previous appointment.  (R. 244.)  Dr. Ahmed again noted swollen hands and edema. (*Id.*)  His assessment was essentially the same, although he included hypothyroidism, and the respiratory infection had cleared up.  (*Id.*)  Tolbert reported feeling better on July 23, 2005, but continued to complain of swelling in her legs, polyuria, and nocturia. (R. 243.)  The results of the physical exam were, for the most part, unremarkable, and Dr. Ahmed's diagnoses remained the same.  (*Id.*)

From August 22, 2005 through March 30, 2006, Tolbert saw Dr. Ahmed for "family planning," among other things.  (R. 235-241.)  On August 2, 2005, August 22, 2005, September 24, 2005, and October 24, 2005, Tolbert complained of lower abdominal pain and backache.  (R. 239-242.)  On those dates, Dr. Ahmed continued to

note edema in the lower extremities and "some rhonchi, distant wheezing" of the lungs. (*Id.*)  He continued to assess pedal edema, hypertension, and hypothyroidism.  (*Id.*)  A family history of diabetes was also noted.  (*Id.*)

By January 3, 2006, Tolbert's headaches and dizziness had returned and she still suffered from backaches, although her dizziness and backaches had improved by February 1, 2006.  (R. 237-238.)  On March 2, 2006, Tolbert suffered from nausea, vomiting, abdominal pain, headaches, and recent episodes of palpitation.  (R. 236.)  On March 30, 2006, Tolbert complained of swelling in both legs and continuing headaches. (R. 235.)  On April 29, 2006, she complained of pain in her knee joints, along with numbness and tingling in her fingers.  (R. 234.)

As of May 9, 2006, Tolbert continued to suffer from severe pain in both knee joints, as well as swelling of both knees and ankle areas.  (R. 233.)  Dr. Ahmed assessed arthralgia, obesity, arthritis, and pedal edema, and prescribed Volteran.  (*Id.*) On June 5, 2006, Tolbert reported that the pain in her joints had improved with the Volteran, but she continued to complain of swelling of her legs, right foot and ankle, as well as numbness and tingling in her fingers.  (R. 232.)  Tolbert had similar complaints on July 17, 2006, and explained that she experienced "knee joints pain and shortness of breath with a little walk."  (R. 268.)  An examination of her lungs revealed no rhonchi and no wheezing.  (*Id.*)  Dr. Ahmed noted "moderate obesity" at the July 17 appointment and every appointment thereafter.  (R. 268-271, 372-374.)

On August 23, 2006, along with the pain and swelling of her knees and legs, Tolbert reported a severe backache.  (R. 269.)  She also experienced shortness of breath while sleeping at night.  (*Id.*)  She voiced similar concerns on October 3, 2006, November 1, 2006, and November 29, 2006.  (R. 270-271, 382.)

In a letter dated November 30, 2006, Dr. Ahmed stated that Tolbert had been under his care for hypertension, arthritis, chronic backache, moderate obesity, sleep apnea, and hypothyroidism.  (R. 264.)  In Dr. Ahmed's "best opinion," because of these problems, Tolbert's "physical routine is restricted" and she "will not be able to do routine work."  (*Id.*)

On March 6, 2007, Tolbert complained of palpitations and "feeling very hot and cold, but sweating."  (R. 372.)  She had pain in her right shoulder, both legs, and knees.  (*Id.*)  She continued to voice concerns of knee pain, and shortness of breath on April 11, 2007 and July 16, 2007.  (R. 373-374.)  Dr. Ahmed continued to assess backache, arthralgia, hypertension, and hyper/hypothyroidism and continued to prescribe Tylenol, Synthroid, Plendil, Volteran, Ecotrin, Folic Acid, and Vitamin C.  (*Id.*)

### b.    Rush University Medical Center

Records reveal that Tolbert presented to the Rush emergency room on June 20, 2007 complaining of left, lower back pain.  (R. 358-360.)  More specifically, Tolbert reported that she had suffered from left lower back pain intermittently for the past year, which had worsened over the prior two days.  (R. 358.)  A history of hypertension and hypothyroidism was noted.  (*Id.*)  A physical exam in the emergency room revealed primarily normal results apart from "paraspinal tenderness," and "low back tenderness with bilateral straight leg rise."  (R. 359.)  The final diagnosis was a low back strain and Tolbert was discharged the same day with a prescription for Motrin and Valium.  (R. 360.)

Following her emergency room visit, Tolbert continued receiving care from various physicians at Rush University Internists.  At her first appointment on July 5, 2007, she reported that her back pain had gotten "better," but she still experienced

some pain.  (R. 293.)  The physical examination by Dr. Ruby Pouw revealed primarily normal results other than extreme obesity.  (*Id.*)  Dr. Pouw assessed chronic lower back pain, morbid obesity, hypertension, and hypothyroidism.  (R. 294.)  Dr Pouw also gave Tolbert a referral for physical therapy.  (R. 294, 369.)

On August 20, 2007, x-rays were taken of Tolbert's knees and back.  (R. 333-334.)  The knee x-rays revealed "mild right medial compartment narrowing," and mild to moderate "marginal hypertrophic spurring of the patellofemoral compartments."  (R. 333.)  Sunrise views of both knees demonstrated "lateral chondromalacia patella, slightly greater on the left" and "prominent epicondylar hypertrophic spurring bilaterally in the region of the lateral femoral condyles and the left medial femoral condyle."  (*Id.*)  There was no knee effusion.  (*Id.*)  As for Tolbert's back, the x-rays demonstrated "no significant disc space narrowing and preservation of lumbar vertebral body heights."  (R. 334.)  Lateral flexion and extension views showed no evidence of instability and the sacroiliac joints appeared normal.  (*Id.*)  The exam was "notable for the presence of four lumbarized vertebral bodies."  (*Id.*)

On August 23, 2007, Tolbert classified her lower back pain as a five out of ten on average and reported intermittent knee pain.  (R. 295.)  Dr. Dunn's exam on that date showed mild lumbar paraspinal tenderness and mild tenderness to palpitation of the right knee, but no effusion.  (*Id.*)  Dr. Dunn again gave Tolbert a referral for physical therapy.  (R. 296, 368.)  By September 27, 2007, Tolbert's lower back pain and knee pain continued and she reported she had started physical therapy.  (R. 297.)  She further reported difficulty in motivation for diet and exercise, and trouble sleeping.  (*Id.*)  She received a referral for a sleep study.  (R. 298.)

On February 7, 2008, Tolbert reported intermittent palpitations, shortness of

breath, and dizziness. (R. 299.) She had not yet followed through with the sleep study, but Dr. Dunn encouraged her to do so and explained the cardiac complications associated with sleep apnea. (R. 300.) Tolbert also reported only partial compliance with the Synthroid prescription for her hypothyroidism. (R. 299.) As of February 14, 2008, she was still not taking the Synthroid consistently. (R. 302.) Also on that date, the examining physician again counseled Tolbert on diet management and weight loss strategies. (*Id.*) On May 28, 2008, Tolbert was reminded of the importance of following her medication regimen with respect to the Synthroid. (R. 303.)

On December 15, 2008, Tolbert returned to Rush with complaints of feeling weak for the past two weeks, as well as knee and back pain. (R. 308.) The physician noted edema. (*Id.*) Tolbert underwent an EKG at her December 15 appointment, the results of which were "O.K." (R. 309, 330.) On February 3, 2009, she complained of knee pain, lumbar pain, and fatigue, among other things. (R. 315.) Her weight was documented as 396.3 pounds. (*Id.*)

On February 10, 2009, Tolbert finally underwent the sleep study her physicians at Rush had repeatedly recommended because she was "tired of feeling weak." (R. 335.) Her history of obesity, hypertension, hypothyroidism, and degenerative joint disease was noted. (*Id.*) Tolbert complained of excessive daytime sleepiness, apneic episodes, and "nocturia x4 years." (*Id.*) Tolbert reported that her excessive daytime sleepiness causes her to fall asleep during any period of inactivity, and at times during conversation. (*Id.*) She claimed that her sleepiness interfered with her past job as a security worker because she had difficulties staying awake. (R. 335-336.) She also complained of increased irritability and sadness. (R. 337.) The results of Tolbert's sleep study were consistent with obstructive sleep apnea and a CPAP machine was

prescribed.  (R. 338.)  The physicians also recommended a formal weight loss program. (*Id.*)

On November 30, 2009, Tolbert complained of depression and a decreased interest in daily activities.  (R. 394.)  Her physician at Rush prescribed Zoloft.  (R. 393.) As of March 8, 2010, Tolbert was still depressed and complained of dizziness.  (R. 401.) She had lost twenty five pounds.  (*Id.*)  Edema was noted.  (*Id.*)

Tolbert underwent a psychiatric evaluation on August 26, 2010.  (R. 403-409.) She expressed feelings of depression on and off for the past six to seven years, which had worsened since she lost her security job.  (R. 403.)  The clinician assessed depression and recommended an increase in Zoloft and psychotherapy.[1]  (R. 405.)

### 2.    State Agency Consultants

Tolbert underwent a consultative examination on August 3, 2006 with Dr. Fauzia A. Rana of Lake Shore Medical Clinic, Ltd.  (R. 248-252.)  Dr. Rana first noted a history of hypothyroidism, arthralgia, and high blood pressure.  (R. 248.)  With respect to her hypothyroidism, Tolbert reported that she "had radioactive iodine treatment twice in 1998 at Mt. Sinai Hospital."  (R. 248.)  Tolbert further reported that she had been on thyroid replacement therapy ever since.  (*Id.*)  She also complained of being forgetful. (*Id.*)  As for her arthralgia, Tolbert complained of aches all over her body and especially

---

[1] We note that the ALJ did not consider any of the medical records on pages 361-409 (Exs. 9F-18F) of the Administrative Record as those documents were submitted to the Appeals Council after the ALJ rendered his decision.  Because the Appeals Council ultimately denied Tolbert's request for review, those records "cannot now be used as a basis for a finding of reversible error."  *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).  We note, however, that some of those records are simply duplicate copies of records that were previously submitted to the ALJ.  (*See* R. 361-366, 376-381.)  Further, although Exhibit 8F had not been admitted to the ALJ prior to the hearing, it is clear he received that exhibit after the hearing and considered those records when reaching his decision.  (*See* ALJ's Decision, R. 69-76, citing 8F repeatedly.)

in her knees and lower back.  (*Id.*)  She claimed she could walk only about one block before getting tired.  (*Id.*)  She denied ever having x-rays taken.  (*Id.*)  Lastly, in regard to her history of high blood pressure, Tolbert explained that she had been taking blood pressure medication for about two years.  (*Id.*)  She denied a history of heart disease, diabetes, or asthma.  (*Id.*)  Although Tolbert reported occasional palpitations, she denied chest pain or shortness of breath.  (*Id.*)

On physical examination, Dr. Rana reported the following.  Tolbert was 66 inches tall and weighed more than 350 pounds.  (R. 248.)  Blood pressure and pulse were normal.  (R. 249.)  Dr. Rana described Tolbert as a "morbidly obese female who is alert and oriented in time, place and person."  (*Id.*)  She was cooperative and exhibited no acute distress.  (*Id.*)  Tolbert had no difficulty breathing and "no difficulty in various movements like getting up from the chair, stepping up on the stool, lying down and sitting down on the examining table."  (*Id.*)  An examination of the extremities revealed "no edema, ulcers or varicosities."  (*Id.*)

As for the musculoskeletal system, Dr. Rana initially noted that it was "hard to assess swelling of any joint due to weight."  (R. 249.)  But, she found no redness, warmth or tenderness of any joint.  (*Id.*)  Flexion of both knees in the sitting position was 115/150 degrees, secondary to obesity, with no complaints of pain.  (*Id.*)  Gross and fine manipulation of either hand was normal, as were her fist and grip capabilities.  (*Id.*)  "Examination of the spine showed no local tenderness or paravertebral muscle spasm," and Dr. Rana found no limitation of movements of either the cervical, dorsal or lumbosacral spine.  (R. 250.)  Tolbert's gait was recorded as normal without an ambulatory aid.  (*Id.*)  Motor power and reflexes were normal.  (*Id.*)  Dr. Rana's examination of all other systems yielded unremarkable results.  (R. 249-250.)

Following her examination, Dr. Rana assessed "status post radioactive iodine treatment for grave's disease," controlled high blood pressure with no evidence of congestive heart failure, morbid obesity, and "possible degenerative arthritis." (R. 250.)

Dr. Towfig Arjmand completed a "Physical Residual Functional Capacity Assessment" on August 16, 2006. (R. 253-260.) Dr. Arjmand's primary diagnosis was obesity and his secondary daignosis was hypertension and a thyroid problem. (R. 253.) With respect to exertional limitations, Dr. Arjmand concluded that Tolbert could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight hour workday; sit about six hours in an eight hour workday; and could engage in an unlimited amount of pushing and/or pulling. (R. 254.) Dr. Arjmand also found that Tolbert could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. (R. 255.) According to Dr. Arjmand, Tolbert could also occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) He found no manipulative, visual, or communicative limitations. (R. 256-257.) As for environmental limitations, Dr. Arjmand determined that Tolbert should avoid concentrated exposure to hazards like machinery and heights as a result of her "marked obesity." (R. 257.)

In the "Additional Comments" section of the RFC Assessment, Dr. Arjmand described Tolbert as obese, with a BMI over 56%. (R. 260.) He noted her history of hypothyroidism, hypertension, and arthralgia. (*Id.*) He further noted her normal gait, station, and spine. (*Id.*)

On January 14, 2007, Dr. David Bitzer completed another "Physical Residual Functional Capacity Assessment." (R. 272-279.) He reported hypertension, arthritis, and obesity as the primary diagnosis, and sleep apnea and hypothyroidism as the

secondary diagnosis. (R. 272.) Dr. Bitzer found similar exertional limitations as did Dr. Arjmand. (R. 274.) Dr. Bitzer determined that Tolbert could frequently stoop, but could only occasionally climb ramps, stairs, balance, kneel, crouch or crawl, and could never climb ladders, ropes, and scaffolds. (R. 273.) According to Dr. Bitzer, Tolbert's ability to climb ramps, stairs and ladders was limited by the decreased range of motion in her knees, her pain and swelling, and her body habitus. (*Id.*) He found no manipulative, visual or communicative limitations. (R. 275-276.) Like Dr. Arjmand, Dr. Bitzer concluded that Tolbert should avoid concentrated exposure to hazards such as machinery and heights due to her obesity. (R. 276.) He also cited Tolbert's sleep apnea and daytime drowsiness as a reason to avoid such hazards. (*Id.*)

In the section titled "Treating or Examining Source Statements," Dr. Bitzer took issue with Dr. Ahmed's November 30, 2006 statement that Tolbert's physical routine is restricted and that she is not able to do routine work. (R. 278.) Dr. Bitzer described the statement as "vague," and noted that Dr. Ahmed's "exam documentation does not indicate any physical findings other than obesity and edema of lower extremities." (*Id.*) In the "Additional Comments" section, Dr. Bitzer noted Tolbert's obesity, and her history of hypertension and hypothyroidism. (R. 279.) He also commented on Tolbert's "multiple arthralgias," but noted her ability to ambulate without the use of an assistive device. (*Id.*) He also noted her complaints of drowsiness during the day and waking up during the night, as well as her recent prescription for a CPAP machine. (*Id.*)

## C. Claimant's Testimony

Tolbert appeared at the hearing before ALJ Harmon on June 10, 2009 without the assistance of counsel and gave the following testimony. At the time of the hearing, Tolbert was 37 years old. (R. 17.) She started high school, but did not complete one

full year or receive her GED. (*Id.*) Tolbert is single and resides with her three children and her grandchild. (R.18.) At the time of the hearing, she was 5'7" and weighed about 400 pounds. (R. 26-27.)

In the late nineties, Tolbert worked as a home health care provider for elderly individuals. (R. 20, 212.) Tolbert also worked as a home health care provider for a few months in 2005, but stopped working because she did not have a CNA certificate. (R. 28-29.) In these positions, Tolbert testified that she would help bathe her clients, move them around, or take them shopping. (R. 20, 40-41.) Because Tolbert has never had a driver's license, she traveled with her clients on "disabled transportation." (R. 29.)

Tolbert worked as a landscaping worker from 1998-2000. (R. 20, 171.) In that position, she had to lift and carry bags of dirt, plants and trees, which weighed as much as fifty pounds. (R. 21.) She left that position because "it was getting to be a little bit too much" and "all that lifting was taking a toll on [her]." (R. 20.)

Tolbert worked as a security officer from 2000 to 2005. (R. 21, 171.) Among other tasks, Tolbert logged in truck drivers and checked the tool boxes of workers entering the factory at which she worked. (R. 23.) Tolbert had to lift the toolboxes that were not on wheels, which generally weighed more than twenty pounds. (R. 23, 41.) She also made rounds of the factory every hour on Tuesdays. (R. 24.) Tolbert was fired from her position as a security officer on April 6, 2005 because she refused to submit what she considered a "false statement" regarding an incident with a co-worker. (R. 27-28.)

When asked how she spends her time during the day, Tolbert responded that she tries to stay awake, but dozes off all day. (R. 34.) According to Tolbert, she always falls asleep while reading or watching television. (R. 35.) Tolbert sometimes tries to

play with her grandchild.  (R. 34.)  Tolbert has not noticed any improvement from the CPAP machine she uses at night.  (*Id.*)  At the time of the hearing, she had no energy.  (*Id.*)

Tolbert does not use public transportation and has not since 2007 because she cannot stand and wait that long.  (R. 29-30.)  Her sister drove her to the hearing.  (*Id.*)  Tolbert testified that she has not cooked since 2007 and that her sister or twenty-one year old daughter cook for her now.  (R. 30.)  She testified that her sister and her daughter also shop for her groceries and clothing.  (R. 34.)  Tolbert does not do household chores because when she tries to do so the lower part of her back locks up on her.  (R. 30.)

Tolbert testified that she suffers from pain in her lower back, knees, ankles, thighs, and arms, but most often in her lower back and ankles.  (R. 36.)  According to her testimony, her back, knee, and thigh pain is "always there."  (*Id.*)  She rated her pain level a nine on a ten-point scale.  (*Id.*)  For pain relief, Tolbert uses Tylenol with codeine and icy hot patches, which she claims ease the pain, but not entirely.  (R. 36-37.)

Tolbert testified that she can walk about a half a block before the contracting of her lower back muscles forces her to stop.  (R. 37.)  She has been told this may be the result of "overworked muscles," her weight, or a lack of strength in her "muscles in [her] front."  (*Id.*)  Tolbert testified that she has been given a walker, which she uses when she is out walking.  (*Id.*)  She did not bring the walker to the hearing.  (*Id.*)

Tolbert said that she can stand for about five minutes before her pain starts and for about eight minutes before she cannot stand any longer.  (R. 38.)  She can sit for longer than one hour.  (*Id.*)  Tolbert was not certain how much she could lift and carry,

but testified that the heaviest thing she lifted in the last thirty days was her granddaughter who weighs about twenty-five pounds. (*Id.*) Tolbert can dress herself and bathe herself by sitting down on a chair in the tub. (*Id.*) She can climb stairs, but it is painful and she becomes short of breath. (R. 38-39.)

### D.    Vocational Expert's Testimony

Vocational expert ("VE") Glee Ann L. Kehr also appeared and testified at the administrative hearing. VE Kehr described Tolbert's home care position as a nurse's aid, which she classified as "medium in physical demand," and "low and semi-skilled in nature." (R. 42.) She classified the landscape laborer position as heavy and unskilled and the security guard position as medium and semi-skilled. (*Id.*)

The ALJ asked the VE to consider a hypothetical individual of the claimant's age, with a limited education, "past relevant work in medium and heavy categories," and who suffers from "[a] morbid obesity condition with a BMI in excess of 54." (R. 42.) ALJ Harmon asked VE Kehr to further consider that the hypothetical individual was limited to unskilled work of a routine nature, and could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit for six hours in an eight hour day; stand and walk for six hours in an eight hour day; occasionally climb stairs or ramps; occasionally stoop, squat, crouch, kneel; never work on ladders, ropes or scaffolding; never work at unprotected heights or around hazardous moving machinery; and never operate foot or leg controls. (*Id.*) When asked what work, if any, such an individual could perform, the VE responded that the individual could work as a rental clerk, a counter clerk, or an office helper, all of which are unskilled positions performed at the light level. (R. 42-43.)

The ALJ then asked the VE to determine which jobs the hypothetical individual

could perform if she was limited to standing and walking for a maximum of two hours in an eight hour day. (R. 43.) The VE responded that such an individual would be limited to work at the sedentary level and could work as an order clerk, a telephone clerk, or an account clerk. (*Id.*) When the ALJ further limited the hypothetical individual to sitting for only four hours out of an eight hour day and "sleeping due to dozing off one to two hours total" in an eight hour day, the VE stated that such limitations would preclude all competitive employment. (*Id.*)

## II.    Legal Analysis

### A.    Standard of Review

We will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). But, we will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

Further, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate his assessment of the

evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.      Analysis Under the Social Security Act**

As ALJ Harmon explained in his written decision, to qualify for SSI or DIB, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); *see also,* 42 U.S.C. § 1382c(a)(3)(A).  To determine whether a claimant is disabled, the ALJ must apply the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001).  At step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

ALJ Harmon applied this five step analysis.  At step one, ALJ Harmon determined that Tolbert had not engaged in substantial gainful activity since April 1,

2005. (R. 71.) Next, at step two, he found that Tolbert had the following severe impairments: obstructive sleep apnea, hypothyroidism, morbid obesity, arthritis, and hypertension. (*Id.*) At step three, ALJ Harmon concluded that Tolbert does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 72.)

Next, before moving to step four, ALJ Harmon assessed Tolbert's residual functional capacity ("RFC"). ALJ Harmon found that Tolbert has the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a): unskilled, routine work, requiring lifting/carrying 20 pounds occasionally and less than 10 pounds frequently, sitting 6 hours in an 8-hour day, standing/walking 2 hours in an 8-hour day, no operation of foot/leg controls (complaint of swelling of lower extremities), no climbing of ladders/ropes/scaffolds or work at unprotected heights or around hazardous machinery, and occasionally climbing stairs/ramps, stooping, squatting, crouching, and kneeling." (R. 73.) Based on this RFC, the ALJ determined that Tolbert is unable to perform any of her past relevant work. (R. 74.) Lastly, at step five, ALJ Harmon found that Tolbert could perform jobs that exist in significant numbers in the national economy, including order clerk, telephone clerk, and account clerk. (R. 75.) As a result, ALJ Harmon entered a finding of "not disabled." (*Id.*)

Tolbert now argues that the ALJ failed to consider Tolbert's impairments, including her obesity, in the aggregate, erred in assessing her credibility, and ignored objective medical evidence supporting a determination that she is disabled.

### C.    The ALJ Properly Considered Tolbert's Impairments in the Aggregate.

Tolbert first argues that the ALJ failed to consider her impairments in the

aggregate in direct contravention of the Social Security Act and Seventh Circuit precedent. More specifically, Tolbert argues that the ALJ failed to consider the effect of her well-documented obesity in connection with her other impairments, including her arthritis and purported debilitating pain. We disagree.

It is well settled that the ALJ is required to consider the claimant's impairments in combination and "must factor in obesity when determining the aggregate impact of an applicant's impairments." *Arnett v. Astrue*, --- F.3d ----, 2012 WL 1071707, at *6 (7th Cir. 2012) (citing *Martinez v. Astrue*, 630 F.3d 693, 698–99 (7th Cir. 2011)). Additionally, and as Tolbert points out, "the combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." SSR 02-1p, 2000 WL 628049, at *6. But, even if an ALJ fails to explicitly address a claimant's obesity, that failure may be harmless if the ALJ adopted "the limitations suggested by the specialists and reviewing doctors" who were aware of the condition, and if the claimant fails to "specify how [her] obesity further impaired [her] ability to work." *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

Here, after finding Tolbert's obesity to be a severe impairment, ALJ Harmon explicitly addressed her obesity during the step three listing determination. (R. 71-72.) He first described her obesity as "a severe, medically determinable impairment which is a negative factor insofar as her musculoskeletal, respiratory and cardiovascular systems." (R. 72.) He also noted that her BMI of 61.4 (as of February 10, 2009) places her in the "extreme" obesity category. (*Id.*; *see also* SSR 02-1p, 2000 WL 628049, at *2

18

(describing the three levels of obesity)).  ALJ Harmon then went on to explain that, even

at such an extreme level of obesity, Tolbert's EKG was "normal," her knee and back x-

rays had not resulted in objective treatment, she has no end organ damage as a result

of her hypertension, and, more importantly, "that she has been able to work at these

extreme weights."  (R. 72.)  Later, when assessing Tolbert's RFC, ALJ Harmon even

credited "the effects of her morbid obesity on functional capacity," and adopted the

assessment of the state agency physician who was well aware of her obesity.  (R. 74.)

On the whole, all of this leaves us to conclude that ALJ Harmon did in fact

consider Tolbert's impairments, including her obesity, in the aggregate.  *See Brothers v.

Astrue*, No. 06 C 7088, 2011 WL 2446323, at *10 (N.D. Ill. June 13, 2011) (finding that

"when taken as a whole, the ALJ's decision indicates that she considered the effect of

[the claimant's] obesity in exacerbating his other impairments.").  We distinguish this

case from *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011) and *Gentle v. Barnhart*, 430

F.3d 865, 868 (7th Cir. 2005) on which claimant relies.  In those cases, the ALJs

provided little in the way of meaningful comment regarding the claimants' obesity.

Because that is not the case here, Tolbert's motion for summary judgment is denied

with respect to this issue.

### D.    The ALJ's Credibility Assessment Was Unreasonable and Not Supported by the Record.

Tolbert also argues that ALJ Harmon failed to properly assess her credibility.  On

this point, we agree.  The credibility determination of the ALJ is governed by SSR 96-

7p, which requires the ALJ to consider the entire case record.  In addition to the

objective medical evidence, the ALJ should consider (1) the claimant's daily activities;

(2) the location, duration, frequency, and intensity of the claimant's pain or other

symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7P, 1996 WL 374186, at *3.

Naturally, the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  It follows then that a reviewing court affords the ALJ's credibility finding special deference and may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported.  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).  Nonetheless, the ALJ must explain his decision in such a way that allows the reviewing court to determine whether he reached the decision in a rational manner, logically based on his specific findings and the evidence in the record.  *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Skarbek v. Barnhart*, 390 F.3d at 505 (7th Cir. 2004)).

In the case at bar, although ALJ Harmon provided more than just the "meaningless" boilerplate template, *see Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), his explanations for discrediting Tolbert's complaints are otherwise unreasonable or unsupported.  First, ALJ Harmon found Harmon "less than credible as to why she quit working in April 2005, testifying it was because she did not have the right certificate (home health job), but in the record she said she was fired due to misconduct - that she 'refused to write a statement that was false for my employer.'" (R. 73.)  Unfortunately, this statement is a plain misrepresentation of Tolbert's testimony that she was fired from

20

her security officer position for not writing the statement, but let go from the home health care position because she did not have the proper certificate. (R. 27-29.) Given the ALJ's misreading of the record on this issue, this reason for discrediting Tolbert is entirely unsupported. And, in our opinion, this error is not necessarily cured by the ALJ's blanket statement that she left work for reasons not related to job performance.

ALJ Harmon also discredited Tolbert's statement that she used a walker because she did not bring the walker to the hearing and there was no mention of an assistive device in the medical records. But, as the Seventh Circuit recently explained, "the fact that an individual uses a cane not prescribed by a doctor is not probative of her need for the cane in the first place." *Eakin v. Astrue*, 432 Fed. Appx. 607, 613 (7th Cir. 2011) (citing *Terry v. Astrue*, 580 F.3d 471, 477–78 (7th Cir. 2009)). And, that Tolbert did not bring an assistive device to a brief administrative hearing does not necessarily support a finding that she has the ability to engage in full time employment.

Additionally, the ALJ took issue with Tolbert's claims of daytime drowsiness, sleepiness, and allegations of napping because "this is not reported in the treating physician's records at any time after the CPAP machine was issued." (R. 74.) As Tolbert points out, she did in fact complain of feeling weak and a lack of energy at the March 23, 2009 appointment at Rush. (R. 317.) In our view, that she did not complain of actual napping or "daytime sleepiness" is, as Tolbert states, a distinction without a difference. We also find little logic behind the ALJ's criticism of Tolbert's testimony that she last saw Dr. Ahmed in 1997. (R. 74.) Even a cursory review of the records confirms that she likely misspoke. Lastly, we note that ALJ Harmon did not even touch on Tolbert's daily activities other than a passing reference to sporadic exercise. (*See* R. 72.)

Given these shortcomings, we cannot say that the ALJ's credibility assessment, as set forth in the decision before us, was reasonable or supported by the evidence and we find that remand is required. The ALJ is reminded of his duty to build an accurate and logical bridge between the evidence in the record and his credibility determination.

### E. The ALJ's Explanation for Discounting Dr. Ahmed's Opinion.

Given our decision to remand this matter, we comment only briefly on claimaint's remaining argument regarding the ALJ's failure to credit the opinion of her treating physician, Dr. Ahmed. As mentioned above, on November 30, 2006, Dr. Ahmed, who saw claimant from 2005 through 2007, submitted a letter indicating that Tolbert's "physical routine is restricted" and she "will not be able to do routine work." (R. 264.)

"A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *see also* 20 CFR. § 404.1527(c)(2). However, if the ALJ declines to give controlling weight to the opinion of a treating physician, he must offer "good reasons" for discounting that opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); 20 CFR § 404.1527(c)(2).

Here, the only explanation ALJ Harmon gave for disregarding Dr. Ahmed's opinion was that "it predates the CPAP machine treatment." (R. 74.) At first glance this might be a good reason, among others, to discredit that opinion. But, when we consider that the ALJ then fully credited the opinion of Dr. Arjmand, which also predated the CPAP treatment, we realize that this explanation is far from "good." This is not to say that Dr. Ahmed's opinion is necessarily entitled to controlling weight. *See Burnam v.*

*Astrue*, No. 10 C 5543, 2012 WL 710512, at *12 (N.D. Ill. Mar. 5, 2012) ("An ALJ is not required to accept a doctor's opinion if it is brief, conclusory, and inadequately supported by clinical findings.") (quotation omitted).[2]  Rather, on remand, if the ALJ declines to give that opinion controlling weight, he must properly articulate his reasons for doing so.  And, pursuant to 20 CFR § 404.157(c), the ALJ should take care to "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

## IV.   Conclusion

For the reasons set forth above, claimant's motion for summary judgment is granted in part and denied in part.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

---

[2] The Commissioner is also correct that opinions on issues reserved to the Commissioner, *i.e.*, that a claimant is unable to work, are not entitled to "special significance."  *See* 20 CFR § 404.1527(d). But here, Dr. Ahmed's letter also includes a statement regarding Tolbert's "physical routine," which warrants comment on remand.

**Dated:** April 13, 2012